**[NOT FOR PUBLICATION]**

**[38, 40, 42]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

JACK L. FROLOW,

      Plaintiff,

      v.

WILSON SPORTING GOODS CO.

      Defendant.

_____

Civil Action No. 3:05-cv-04813-FLW

**OPINION**

**WOLFSON, United States District Judge**

      Presently before the Court are the Motions of Defendant Wilson Sporting Goods Co., ("Wilson"), for inter alia, Summary Judgment Regarding the Licensed Articles of Plaintiff Jack L Frolow ("Frolow").  Wilson seeks Summary Judgment as a matter of law that: (1) the 42 disputed racquet models identified by Frolow are excluded as Licensed Articles from the License Agreement between Frolow and Wilson; and (2) the only racquet models subject to an audit of sales are the undisputed models identified in Appendix B ("Undisputed Racquet Models") of Wilson's Motion for Summary Judgment.  Wilson also requests that:  (1) the Court exclude from consideration Frolow's Initial and Supplemental Expert Reports as inadmissable under Daubert;

(2) the Court exclude from consideration Frolow's Reply to Wilson's Expert, William D.

Severa's Expert Report, as untimely; (3) the Court dismiss Frolow's claim that Wilson induced

infringement of the '372 Patent by selling lead tape in England;[1] (4) the Court dismiss Frolow's

claim that using a Wilson trademark ("Hammer"), on any disputed racquet equates with patent

infringement, or otherwise brings a disputed racquet within the claims of the '372 Patent;[2] (5) the

Court dismiss Frolow's claim against Wilson for patent mis-marking;[3] (6) no racquet can be

included as a Licensed Article on the basis that it has a manufacturing specification that may

overlap in value within a limitation of the '372 Patent when no actual racquet literally or

pursuant to the doctrine of equivalents meets any of the claims of the '372 Patent; and (7) only a

playable racquet that is within the claims of the '372 Patent is a Licensed Article and that head

covers are not within the claims of the '372 Patent.

     The Court grants summary judgment in part and denies it in part as to whether the 42

disputed racquet models come within the definition of Licensed Articles.  Summary judgment is

granted in favor of Wilson as to 37 of the 42 disputed racquet models not constituting Licensed

Articles because Frolow failed to provide contrary test data (and couldn't identify any contrary

test data from discovery) that raise an issue of material fact as to whether they fall within his '372

Patent and ultimately come within the definition of a Licensed Article.  However the Court

---

[1]Frolow is no longer asserting that Wilson induces infringement or is a contributory infringer based on its sale of lead tape.  (Pl.'s Fact St. ¶ 56).

[2]The Court notes that all patent infringement claims were already dismissed by Judge Chesler.  See Jeffery A. Key, Certif., Aug. 24, 2007, Ex. 1, William D. Severa Expert Report, Ex. D, Judge Chesler's April 5, 2006 Order.

[3]The Court notes that there was no patent mis-marking claim ever filed by Frolow in this present litigation.  See Compl.

denies summary judgement as to 5 of the disputed racquet models because, although Frolow did not conduct any of his own testing, he was able to reference test data obtained from Wilson in discovery that raises an issue of material fact as to whether they fall within his '372 Patent and ultimately come within the definition of a Licensed Article.

The Court denies Wilson's petition to hold that the only racquet models subject to an audit of sales are the undisputed models because all racquet models that this Court finds to be within the definition of a Licensed Article are subject to an audit of sales.  Wilson's request to find Frolow's Initial and Supplemental Expert Reports inadmissible is denied without prejudice because Wilson failed to assail them with the specificity required under Daubert.  However, the Court grants Wilson's request to strike Frolow's reply expert report because of the nature of its untimely submission.

Wilson's requests to dismiss claims of patent mis-marking, and patent infringement by inducement or contributory conduct are moot, since no such claims are pending before the Court. The Court also finds in favor of Wilson that the use of the trademark "Hammer" and the notion of an overlapping manufacturing specification do not create issues of material fact as to whether any of the 42 racquet models would infringe upon the '372 Patent but for the License Agreement. Finally, the Court holds that head covers for racquet models that this Court finds within the definition of a Licensed Article are also Licensed Articles to the extent that the previous course of performance in the License Agreement shows that royalties have been paid on them.

## I.   PROCEDURAL HISTORY

On October 3, 2005, Frolow filed a Complaint in the United States District Court for the District of New Jersey alleging claims for breach of contract ("Count 1") and patent infringement

("Count 2").  (See Compl.).  On November 23, 2005, Wilson filed a Motion to Compel

Arbitration with respect to Count 1 and to Dismiss the Remainder of Plaintiff's Complaint.  On

April 5, 2006, the Honorable Stanley R. Chesler, U.S.D.J., issued an Order:

> that once the issue of which racquets being sold by Wilson are subject to the
> License Agreement is resolved by the Court, any dispute about the actual
> calculation of damages, including Plaintiff's claim that deductions taken by
> Wilson from net sales were not authorized under the License Agreement, will be
> subject to the dispute resolution mechanism set forth in Section 4.2 of the License
> Agreement.

Jeffery A. Key, Certif., Aug. 24, 2007, Ex. 1, William D. Severa Expert Report, Ex. D, Judge

Chesler's April 5, 2006 Order; (Def.'s Fact St. ¶ 5;  Pl.'s Fact St. ¶ 5).  On October 10, 2006, the

Honorable Garrett E. Brown, Jr., Chief Judge, U.S.D.J., entered an order reassigning the above

captioned case to this Court.  (Judge Brown's Order Reassigning Case, Doc. No. 21, Oct. 10,

2006).  On August 24, 2007, Wilson filed this present Motion for Summary Judgment Regarding

"Licensed Articles," as well as the other requests referenced above.

## II.      FACTUAL BACKGROUND

### A.      Licensed Articles under the License Agreement

On  March 1, 1989, Frolow and Wilson entered into a License Agreement.   Certification

of Jeffrey A. Key ("Key Certif."), Ex. 8, License Agreement; (Def.'s Fact St. ¶ 6;  Pl.'s Fact St. ¶

6).  In the License Agreement U.S. Patent No. 4,690,405 ("the '405 Patent"), and its reissue, U.S.

Reissue Patent No. RE 33,372 ("the '372 Patent"), are defined as "Licensed Patents."  Key

Certif., Ex. 8, License Agreement, at Section 1.1.  (Def.'s Fact St. ¶ 7).  At the time the License

Agreement was entered into, only the '405 Patent had issued.  Key Certif., Ex. 8, ¶ 1.2; (Pl.'s Fact

St. ¶ 7).  Both the '405 Patent and the '372 Patent are now expired, but the '372 Patent was

unexpired during the years, 2001 through 2004, the final royalty bearing years of the License

Agreement that are designated as the Audit Period.  Key Certif., Ex. 1, Severa Expert Report, p.

7; Key Certif., Ex. 8, License Agreement; (Def.'s Fact St. ¶ 8;  Pl.'s Fact St. ¶ 8).

 The License Agreement granted Wilson an exclusive license to use, manufacture or sell

tennis racquets covered by the Licensed Patents.  Key Certif., Ex. 8, License Agreement, at

Section 3.1.  The License Agreement also provided Wilson the exclusive right to use Frolow

Know-How and to use Frolow's name. Key Certif., ¶ 3.1, Ex. 8; (Pl.'s Fact St. ¶ 9).   In exchange,

Wilson agreed to pay Frolow royalties based on 5% of "Net Sales" of the "Licensed Articles"

sold in the United States, and 2% of Net Sales of Licensed Articles sold outside of the United

States.  Key Certif., Ex. 8, License Agreement, at Section 4.1; (Def.'s Fact St. ¶ 10;  Pl.'s Fact St.

¶ 10).  "Licensed Articles" are defined in the License Agreement as: "tennis racquets that are

covered by one or more unexpired or otherwise valid claims contained in the Licensed Patents

and tennis racquets which are based on use of Frolow's know-how."  Key Certif., Ex. 8, License

Agreement, at Section 1.2; (Def.'s Fact St. ¶ 11;  Pl.'s Fact St. ¶ 11).

 Licensed Articles include tennis racquets that incorporate "Frolow know-how."  (Def.'s

Fact St. ¶ 12;  Pl.'s Fact St. ¶ 12).  Frolow contends that this "know-how" was disclosed during

discovery in the form of a lengthy letter to Frank Garrett from Jack Frolow in 1989 after Mr.

Garrett visited Mr. Frolow to discuss such "know-how."  (Pl.'s Fact St. ¶ 12).  However, this

letter, does not appear to be attached to Frolow's response in opposition to Wilson's Motion for

Summary Judgment.  Furthermore, Plaintiff's interrogatory answers do not list any Wilson

racquet sold during the Audit Period that includes Frolow know-how.  Key Certif., Ex. 7,

Frolow's Responses To Wilson's First Set of Interrogs., Resp. Nos. 1 - 3.  In addition, Frolow

confirmed in his deposition that he was unaware of a single Wilson racquet sold during the Audit Period that incorporated Frolow Know-How.  Key Certif., Ex. 2, Frolow Dep., pp. 17-18; see also Key Certif., Ex. 1, William D. Severa Expert Report, March 21, 2007, pp. 44-45.

### B.      Tennis Racquet Head Cover as a Licensed Article

Wilson contends that an accessory, like a head cover, is not a Licensed Article, or Net Sale, since these accessories cannot be shown by testing or otherwise to be part of a "tennis racquet[] that [is] covered" by the claims.  Key Certif., Ex. 1, Severa Expert Report, pp. 42-44; Key Certif., Ex. 8, License Agreement, at Section 1.6; (Def.'s Fact St. ¶ 13).  Licensed Articles are limited by the License Agreement to "tennis racquets that are covered by one or more unexpired or otherwise valid claims contained in the Licensed Patents . . . ."  Key Certif., Exhibit 8, License Agreement, section 1.2.  The claims of the '372 Patent use the word "comprising."  Key Certif. Exh. 1, Severa Expert Report, Ex. B.  Frolow asserts that head covers sold with racquet models falling within the claims of the '372 Patent are included as part of a Licensed Patent since the word "comprising" is open ended.  Key Certif. Ex. 1, Severa Expert Report, Ex. B.

### C.      Frolow's Audit of Wilson's Royalty Payments

Frolow was granted the right under the License Agreement to conduct an audit of Wilson's royalty payments, "but only for three (3) calendar years from the date of audit inquiry."  Key Certif., Ex. 8, License Agreement, at Section 4.2; (Def.'s Fact St. ¶ 14;  Pl.'s Fact St. ¶ 14).  Frolow did not conduct an audit of Wilson's sales from the inception of the License Agreement in 1989, up to his first notice of audit, dated May 13, 2004, in which he requested his first, three year audit of sales under the 1989 License Agreement.  Key Certif., Ex. 2, Frolow

Dep., pp. 52-53; (Def.'s Fact St. ¶ 15;  Pl.'s Fact St. ¶ 15).  An audit was conducted, and a letter

report issued by Frolow's auditor (Joe Gemini), for each of the 4 years (2001, 2002, 2003 and

2004) in the Audit Period.  Key Certification, Ex. 1, Severa Expert Report, Ex. E-H; (Def.'s Fact

St. ¶ 16;  Pl.'s Fact St. ¶ 16).  Gemini, provided a "Schedule 3" in each of the 4 audit letters

identifying racquets Frolow and he contended should have been listed in Wilson's regular royalty

reports as Licensed Articles.  Gemini labeled each respective Schedule 3 as "Racquets Not

Reported by Wilson – U.S. Sales Only Per Wilson Stocked Inventory Report [year]."  Key

Certif., Ex. 1, Severa Expert Report, Exhibits E-H; (Def.'s Fact St. ¶ 17;  Pl.'s Fact St. ¶ 17).

Gemini's audit letters identify a total of 58 Wilson tennis racquet models, for which

Frolow asserts that Wilson: (1) failed to report as Licensed Articles; and (2) failed to pay

royalties. Key Certif. Ex. 1, Severa Expert Report, Ex. F-H; (Pl.'s Fact St. ¶ 17).

Gemini's letters state the basis for listing racquets in each respective Schedule 3 as,

"racquets that weigh 10.9 ounces or less, or racquets that have Hammer in the description of the

racquets." Key Certif., Ex. 1, Severa Expert Report, Ex. E-H; (Def.'s Fact St. ¶ 20;  Pl.'s Fact St.

¶ 20).   However, Gemini's audit letters contained no claim analysis or test data to support his

statement that Wilson improperly excluded certain racquet models from the royalty reports which

he contended fell within the Licensed Patents.  Key Certif. Ex. 1, Severa Exp. Rep., Ex. E-H;

(Pl.'s Fact St. ¶ 21; Def.'s Fact St. ¶ 21).  Wilson replied and rebutted Frolow's audit findings in

letters dated September 15, 2005 (for the Audit Years 2001, 2002 and 2003), and September 20,

2005 (for Audit Year 2004). Key Certif., Ex. 1, Severa Expert Report, Ex. I-J; (Def.'s Fact St. ¶

22;  Pl.'s Fact St. ¶ 22).  In its audit responses, Wilson did not dispute that 26 of the 58 tennis

racquets identified by Frolow and Gemini in Gemini's Schedule 3 list of "Racquets Not Reported

by Wilson" should be Licensed Articles.  Key Certif., Ex. 1, Severa Expert Report, Ex. I-J; (Def.'s Fact St. ¶ 23;  Pl.'s Fact St. ¶ 23).

Wilson did dispute inclusion of 29 of the 58 racquet models listed in Gemini's Schedule 3 charts as Licensed Articles, plus 9 racquets listed in Schedule 2 for which Wilson contends it mistakenly paid royalties, and provided specific '372 Patent claim analysis and specific racquet test and measurement data showing that those 38 tennis racquets were not Licensed Articles, and that they were not within the claims of the '372 Patent.  Key Certif., Ex. 1, Severa Expert Report, Ex. I-J; (Def.'s Fact St. ¶ 24;  Pl.'s Fact St. ¶ 24).  This information was set forth in Table 1 of each of Wilson's audit responses, and labeled "Racquets Falling Outside Of '372 Patent."  Id. Frolow contends that the charts did not provide a complete claim analysis and did not provide specific racquet test results showing that the racquet models in question were not Licensed Articles.  Id.  Wilson's audit response letters identify, in their respective Table 5's, the amount of unpaid royalties for the racquet models that were not contested by Wilson.  The 2001-2004 total of such uncontested royalties total $694,044.35 for the undisputed racquets, and other undisputed under-payments.  Id.  Counsel for Wilson tendered payment of this amount to counsel for Frolow, on or about May 30, 2007.  Key Certif., Ex. 4; (Def.'s Fact St. ¶ 25;  Pl.'s Fact St. ¶ 25).

The Supplemental Expert Report Of Jack Frolow, dated January 10, 2007, discloses the 38 disputed racquets from Frolow's Initial Expert Report, and adds 4 additional racquet models to his discussion. Key Certif., Ex. 10, Frolow Supplemental Expert Report, pp. 7-8; Key Certif., Ex. 2, Frolow Dep., pp. 129-132; (Def.'s Fact St. ¶ 27;  Pl.'s Fact St. ¶ 27).  The '372 Patent has 5 relevant, independent claims that were summarized in a claim chart by Wilson's expert, William Severa, as follows:

-8-

| CLAIM 10 | CLAIM 20 | CLAIM 47 | CLAIM 50 | CLAIM 56 |
|---|---|---|---|---|
| W*Cg < 160 ounce-inches<br><br>Cp > 18.75 inches<br><br>W > 10.7 ounces<br><br>Ia > 80 ounce-inches$^2$<br><br>Longest Vertical String > 9 inches<br><br>Longest Horizontal String > 7.5 inches | W < 10.7 ounces<br><br>Cp > 18.75 inches<br><br>W*Cg < 160 ounce-inches<br><br>Ia > 80 ounce-inches$^2$<br><br>Longest Vertical String > 12 inches<br><br>Longest Horizontal String > 9.5 inches | Ia > 80 ounce-inches$^2$<br><br>f$_1$ > 160 Hertz<br><br>L > 25.5 inches | Ia > 80 ounce-inches$^2$<br><br>f$_1$ > 160 Hertz<br><br>W*Cg < 160 ounce-inches<br><br>Cp > 18.75 inches | Cp / L > 0.7<br><br>Ia / Is > 0.033 |

Key Certif., Severa Expert Report, p. 9; (Def.'s Fact St. ¶ 28;  Pl.'s Fact St. ¶ 28).

Wilson contends that the limitations of each claim should be tested by using a properly strung tennis racquet that a person can use to play tennis.  Key Certif, Ex. 6, Frolow's Responses to Wilson's Second Set of Interrogatories, No. 13; Key Certif., Ex. 2, Frolow Dep. p. 135; Key Certif., Ex. 1, Severa Expert Report, pp. 24, 40 and 41.  (Def.'s Fact St. ¶ 29).  Frolow counters that the '372 Patent specifies the proper tests and procedures to be used in determining whether a racquet is within the scope of the claims of the Licensed Patents.  Key Certif. Ex. 1, Severa Expert Report, Ex. B; Key Certif. Ex. 6, p. 3).

In the claim chart prepared by Severa, "I$_a$" means the racquet's longitudinal "moment on inertia."  (Def.'s Fact St. ¶ 30;  Pl.'s Fact St. ¶ 30).  This "moment on inertia," relates to the mass of a racquet's head away from the longitudinal axis at 3:00 and 9:00.  Id.  The more mass at 3 and 9 (relative to the racquet's overall mass), the more resistant it is to twisting when a player

-9-

hits a shot that is off-center on the racquet string bed.  Key Certif., Ex. 1, Severa Expert Report, pp. 28-30; Key Certif., Ex. 3, Severa Deposition, at pp. 47, 48, 57-59.  The element "$f_1$" relates to the frequency of the racquet (a measurement of structural stiffness).  (Def.'s Fact St. ¶ 31;  Pl.'s Fact St. ¶ 31).  The stiffer the racquet body, the higher the frequency.  Key Certif., Ex. 1, Severa Expert Report, pp. 38-39; (Def.'s Fact St. ¶ 31;  Pl.'s Fact St. ¶ 31).  The element "W" is the weight of the tennis racquet.  Key Certif., Ex. 1, Severa Expert Report, p. 35; (Def.'s Fact St. ¶ 32;  Pl.'s Fact St. ¶ 32). "Cp" stands for "center of percussion," a calculation to locate what is sometimes referred to as "the sweet spot."  Key Certif., Ex. 1, Severa Expert Report, pp. 34-38; (Def.'s Fact St. ¶ 33;  Pl.'s Fact St. ¶ 33).  "L" stands for the length of the racquet from the base of the handle to the top on the head.  Id.  "W*Cg" is a calculation of weight times center of gravity (or balance point), for the tennis racquet. Key Certif., Ex. 1, Severa Expert Report, pp. 34-37; (Def.'s Fact St. ¶ 34;  Pl.'s Fact St. ¶ 34).  "$I_a/I_s$" is a calculation of longitudinal moment of inertia divided by latitudinal moment of inertia.  (Def.'s Fact St. ¶ 35;  Pl.'s Fact St. ¶ 35).  According to Wilson, $I_a/I_s$ relates to how easy it is to manipulate a racquet in play and how the weight is distributed in the racquet body.  Key Certif., Ex. 1, Severa Expert Report, pp. 36-37; (Pl.'s Fact St. ¶ 35).

### D.    Frolow's Expert Reports

Frolow's first expert report is dated November 9, 2006 ("Frolow's Initial Report").  Key Certif., Ex. 9, Frolow Initial Expert Report; (Def.'s Fact St. ¶ 36;  Pl.'s Fact St. ¶ 36).  In Frolow's Initial Report, he identified as "disputed," 38 tennis racquet models that Wilson had identified in its audit response letters as not Licensed Articles.  Key Certif., Ex. 9; (Def.'s Fact St. ¶ 37;  Pl.'s Fact St. ¶ 37).  Frolow did not conduct tests on the 38 racquet models identified in his

Initial Expert Report, so in order to state the physical properties of these tennis racquets, Frolow used the racquet data from tests conducted and supplied by Wilson.  Key Certif., Ex. 2, Frolow Dep., p. 90; Key Certif., Ex. 9, Frolow Initial Expert Report, pp. 6-7; (Def.'s Fact St. ¶ 38). Frolow's Initial Expert Report focuses only upon the single limitation of "$I_a$ greater than 80 ounce-inches squared" that is in most of the claims, and recites arguments why Frolow believes there is literal infringement or that the doctrine of equivalents applies. Key Certif., Ex. 9, pp. 6-9; (Def.'s Fact St. ¶ 39;  Pl.'s Fact St. ¶ 39).

On or about January 10, 2007, Frolow served Wilson with the Supplemental Expert Report of Jack L. Frolow ("Frolow Supplemental Report").  Key Certif., Ex. 10, Frolow Supplemental Expert Report; (Def.'s Fact St. ¶ 43;  Pl.'s Fact St. ¶ 43).  In Frolow's Supplemental Expert Report, Frolow identifies four (4) additional racquet models (in addition to the 38 from his Initial Report), that he argues are within the claims of the '372 Patent pursuant to the doctrine of equivalents.  Key Certif., Ex. 10, Frolow Supplemental Expert Report, p. 7; (Def.'s Fact St. ¶ 44;  Pl.'s Fact St. ¶ 44).  Frolow confirmed in his deposition that the total number of disputed racquets were 42 -- 38 from his Initial Expert Report, plus 4 others identified in his Supplemental Expert Report.  Key Certif, Ex. 2, Frolow Dep., pp. 126-133; (Def.'s Fact St. ¶ 45;  Pl.'s Fact St. ¶ 45).  Frolow did not conduct testing on his own, but based upon the testing undertaken by Wilson and Production Evaluation Reports obtained in discovery, Frolow asserts that the facts demonstrate that the disputed tennis racquets perform substantially the same function as the claimed invention in substantially the same way with substantially the same result. (Frolow Decl. ¶¶ 15, 23-24, Ex. D, G; Zidel Decl. ¶¶ 14-28, Ex. D-F.)

E.    Wilson's use of the Trademark "Hammer"

Frolow argues in his Initial Expert Report that a "basis" for claiming Wilson racquets are within the claims of the '372 Patent is that Wilson uses the trademark "Hammer" on certain racquet models.  (Def.'s Fact St. ¶ 50;  Pl.'s Fact St. ¶ 50).  Nonetheless, Frolow admits that "Hammer" is a trademark owned exclusively by Wilson, that "Hammer" is not part of the License Agreement and that Frolow has no rights in the trademark "Hammer."  Key Certif., Ex. 7, Frolow's Answers to Wilson's First Set Of Admissions, Answer Nos. 5-8; Key Certif., Ex. 1, Severa Expert Report, pp. 48-49.  (Def.'s Fact St. ¶ 54;  Pl.'s Fact St. ¶ 54).

Frolow relies on a Wilson affidavit (the "Garrett Affidavit") filed on April 13, 1994 by Frank Garrett, Vice President of Technology for Wilson, in the case of <u>Wilson Sporting Goods Co. and Jack L. Frolow v. Prince Sports Group, Inc.</u>, U.S.D.C., District of New Jersey, case No. 94-726 (GEB) (referred herein as the "Prince Lawsuit").  The Prince Lawsuit was filed by Frolow and Wilson (as exclusive Licensee of the '419 Patent and the '372 Patent) against Prince Sports Group Inc. for infringement of the '419 Patent and the '372 Patent.  The Garrett Affidavit regards Wilson racquets that bore Wilson's trademark "Hammer," in 1996 and prior thereto.  Key Certif., Ex. 9, Frolow Initial Expert Report, p. 8.  Garrett averred that "Wilson first introduced its Hammer rackets [sic] in the United States in 1990. The Hammer racket [sic] was originally designed, developed and made in accordance with the claims of the '419 patent and the '372 patent pursuant to a license of those patents from Jack L. Frolow."  Key Certif., Ex. 1, Severa Expert Report, p. 47.

### F.   Manufacturing Specification

Frolow states that if Wilson's manufacturing specifications provide a range of $I_a$

values that overlap with one of the '372 claim limitations, one must also evaluate the test data for that same claim limitation.  Zidel Decl. ¶¶ 14-28, Ex. D-F; (Pl.'s Fact St. ¶ 62).  This is consistent with Wilson's position, that actual testing must be done to determine if a racquet model falls within the claims of the '372 Patent.  In addition, Mr. Severa states in his expert report that the manufacturing "specification ranges are generally quite large, and racquets produced have characteristics that fall within only a portion of the specification range."  Key Certif., Exh. 1; Severa Exp. Rep. pp. 45-46.

### G.   Racquets Marked with a Licensed Patent Number

Frolow also argues that 14 of the 42 disputed racquets are marked with a Licensed Patent number, and that accordingly those 14 racquets infringe upon the '372 Patent.  Key Certif., Ex. 10, Frolow Supplemental Report, p. 13, Ex. M; (Def.'s Fact St. ¶ 65;  Pl.'s Fact St. ¶ 65).  Frolow or his representative was given the opportunity to inspect the 14 racquet bodies that were inadvertently marked with the '372 Patent number (as well as with Frolow's previously expired '419 Patent number). Key Certif., Ex. 1, Severa Expert Report, pp. 49-51; Key Certif., Ex. 10, Frolow's Supplemental Expert Report, p. 13, Ex. M.  Wilson contends that in each instance, the mis-marking occurred under the mistaken impression that the racquets were covered by the claims of the '372 Patent.  Key Certif., Ex. 1, Severa Expert Report, pp. 49-51.

### H.   Previous Prince Litigation and Prince Settlement Agreement Between Frolow Wilson, and Benetton Sportsystem USA, Inc. Stipulating to Claim Construction of the '419 Patent and '372 Patents

#### 1.   Prince Settlement Agreement

After obtaining summary judgment against Benetton Sportsystem USA, Inc. (maker

of Prince racquets) ("Prince") during the Prince Lawsuit, the parties entered into a settlement agreement on April 23, 2001 (the "Prince Settlement Agreement").  Key Certif., Ex. 1, Severa Expert Report, pp. 14-17, Ex. K.  In the Prince Settlement Agreement between Frolow, Wilson, and Prince, the "$I_a$" limitation of the '372 Patent was specifically addressed and Frolow agreed to the ordinary meaning of the limitation as follows: "the parties deem that any $I_a$ value greater than or equal to 80.01 ounce-inches is greater than 80 ounce-inches[2], and any $I_a$ value less than 80.01 ounce-inches is not greater than 80 ounce-inches[2]." Key Certif., Ex. 1, Severa Expert Report, pp. 14-17, Ex. K, p. 8.

### 2. Garrett Affidavit

In the Garrett Affidavit filed during the Prince Lawsuit eleven racquets were listed as being sold by Prince in 1994, including measured characteristics of those racquets.  Key Certif., Ex. 2, Frolow Deposition, pp. 30-32; Key Certif., Ex. 1, Severa Expert Report, Ex. L; (Def.'s Fact St. ¶ 87;  Pl.'s Fact St. ¶ 87).  One of the eleven racquets, the Prince CTS Synergy Lite Midplus racquet, not identified as an infringing racquet, had a measured moment of inertia about the longitudinal axis ($I_a$), of exactly 80 ounce-inches squared.  Key Certif., Ex. 2, Frolow Dep., pp. 32-33; Key Certif., Ex. 1, Severa Expert Report, Ex. L, at p.11; (Def.'s Fact St. ¶ 89;  Pl.'s Fact St. ¶ 89).  The Prince CTS Synergy Lite Midplus racquet, literally met all of the remaining limitations on independent claim 20 of the '372 Patent.  Key Certif., Ex. 2, Frolow Dep., pp. 30-33; Key Certif., Ex. 1, Severa Expert Report, Ex. L, at p.12; (Def.'s Fact St. ¶ 90;  Pl.'s Fact St. ¶ 90).  Frolow contends that he had no knowledge of the Garrett Affidavit filed in the Prince Lawsuit, since it was prepared solely by Wilson.  (Pl.'s Fact St. ¶ 87).

### I. Prosecution History

-14-

The prosecution history of the '372 Patent (and the '405 Patent, which was reissued as the '372 Patent) shows that Frolow amended the pending claims (that ultimately became independent claims 10, 20, 47 and 50 of the '372 Patent) to add the limitation "the magnitude of $I_a$ is greater than 80 ounce-inches squared."  Key Certif., Ex. 1, Severa Expert Report, pp. 17-22, Ex. N. Wilson argues that the limitations were added specifically in order to overcome rejections dated October 10, 1984, May 3, 1985, October 22, 1985, August 7, 1986, and March 3, 1987.  Id.

Frolow's asserted claims had been rejected by the U.S. Patent and Trademark Office based on prior art patents, including Frolow's own '419 Patent and U.S. Patent No. 3,999,756 ("the Head Patent"), during the prosecution of those claims.  Key Certif., Ex. 1, Severa Expert Report, pp. 19-20, Ex. N; (Def.'s Fact St. ¶ 80;  Pl.'s Fact St. ¶ 80).  In Frolow's second amendment, filed August 30, 1985, Frolow amended the then pending claims 14 [10] and 25 [20].  The amendments to claim 14 [10] included the new limitation of "$I_a$ is greater than 80 ounce-inches squared."  Key Certif., Ex. 1, Severa Expert Report, pp. 19-20, Ex. N; (Def.'s Fact St. ¶ 81;  Pl.'s Fact St. ¶ 81).  Frolow's amendment to claim 25 [20] did not at first include a reference to moment of inertia "$I_a$."  But, Frolow also added claim 46 which included the new limitation of "$I_a$ is greater than 80 ounce-inches squared."  Claim 46 is a dependent claim that depends from claim 1.  In the Remarks accompanying this Amendment, Frolow made the following statements:

> All of the rackets [sic] disclosed by the Frolow patent [the 419 Patent] have a moment of inertia $I_a$ which is less than 80 ounce-inches squared. The patent to Brousselle discloses a racket [sic] of conventional weight and size and does not meet the requirement of 80 ounce-inches squared.
>
> The requirement of $I_a$ being greater than 80 ounce-inches squared requires the string netting to be wider than the racket [sic] disclosed in the Frolow

-15-

patent [the '419 Patent]; thereby making it very difficult to attain the requirements
of claim 1 that the racket [sic] exclusive of the weight means have a weight W
less than 10.7 ounces and a distance Cp greater than 18.75 inches.

Key Certif., Ex. I, Severa Expert Report, pp. 19-20,Ex. N; (Def.'s Fact St. ¶ 82;  Pl.'s Fact St. ¶

82).  On April 23, 1987, in response to the fifth prior art rejection, Frolow once again amended

claim 25 [20].  The following limitation was added "said racket [sic] having a weight distribution

providing for the moment of inertia $I_a$ in ounce-inches squared about said longitudinal axis; . . .

the magnitude of $I_a$ is greater than 80 ounce-inches squared . . . ." Key Certif., Ex. 1, Severa

Expert Report, pp. 20-21, Ex. N; (Def.'s Fact St. ¶ 83;  Pl.'s Fact St. ¶ 83).  On May 11, 1987, a

Notice of Allowance was issued including then pending claim 25 [20].  Key Certif., Ex. 1, Severa

Expert Report, p. 21, Ex. N; (Def.'s Fact St. ¶ 84;  Pl.'s Fact St. ¶ 84).

## III.    SUMMARY JUDGMENT STANDARD

A party seeking summary judgment must "show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Kreschollek v. S. Stevedoring Co.,

223 F.3d 202, 204 (3d Cir. 2000).  In deciding whether summary judgment should be granted, the

Court considers "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits," Fed. R. Civ. P. 56(c), and construes all facts and inferences in the

light most favorable to the nonmoving party.  Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir.

2002).  The Court's function "at the summary judgment stage . . .  is not . . . to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To successfully defend

against a motion for summary judgment, a plaintiff cannot merely rely on the unsupported

allegations of the complaint, and must present more than the "mere existence of a scintilla of evidence" in his favor.  Id. at 252.  "If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted [to the moving party]."  Id. at 252 (citations omitted).

"Whether a product or process infringes the properly construed claims of a patent, literally or under the doctrine of equivalents, is a question of fact." Desper Prods., Inc. v. Qsound Labs, Inc., 157 F.3d 1325, 1332 (Fed. Cir. 1998);  see Tanabe Seiyaku Co. v. United States Int'l Trade Comm'n, 109 F.3d 726, 731 (Fed. Cir. 1997).   However, the summary judgment standard is applicable in patent cases.  Desper Prods., Inc., 157 F.3d at 1332.

> The grant of summary judgment is appropriate in a patent case where the standards set forth in Rule 56(c) are satisfied.  Paragon Podiatry Lab., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1190 (Fed. Cir.1993).  The moving party bears the burden of demonstrating the absence of genuine issues of material fact.  Copelands' Enters. v. CNV, Inc., 945 F.2d 1563, 1565 (Fed. Cir. 1991).  The moving party, however, need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case.  Id. at 1565.

Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994) (citing Celotex Corp., 477 U.S. at 325).

In this case the Court must determine whether certain items sold by Wilson  fall within the scope of a "Licensed Article."  Since a Licensed Article is defined within the License Agreement as articles falling within the constraints of the Licensed Patents, Wilson's Motion is tantamount to a Motion for Non-Infringement.  "Summary judgment of noninfringement may only be granted if, after viewing the alleged facts in the light most favorable to the nonmovant and drawing all justifiable inferences in the nonmovant's favor, there is no genuine issue whether

the accused device is encompassed by the patent claims." <u>Novartis Corp. v. Ben Venue</u>

<u>Laboratories, Inc.</u>, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

> Summary judgment on the issue of literal infringement is proper "when no
> genuine issue of material fact exists, in particular, when no reasonable jury could
> find that every limitation recited in the properly construed claim either is or is not
> found in the accused device." <u>Bai v. L & L Wings</u>, 160 F.3d 1350, 1353 (Fed.
> Cir. 1998).  Summary judgment of noninfringement under the doctrine of
> equivalents is appropriate if "no reasonable jury could determine two elements to
> be equivalent." <u>Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.</u>, 285 F.3d 1353,
> 1360 (Fed. Cir. 2002) (quoting <u>Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>,
> 520 U.S. 17, 39 n. 8 (1997)).

<u>Goldenberg v. Cytogen, Inc.</u>, 373 F.3d 1158, 1163 (Fed. Cir. 2004)**.**

## IV.    DISCUSSION

### A.    ADMISSIBILITY OF FROLOW'S EXPERT REPORTS

As a preliminary matter, the Court must decide whether Frolow's Expert Reports are

admissible for consideration in deciding this Motion for Summary Judgment.[4]  Wilson first

argues that Frolow's Initial and Supplemental Expert Reports are inadmissible because they are

purportedly unreliable; second Wilson argues that Frolow's Reply to Severa's Expert Report

should not be considered because of the untimely nature of its submission.  The Court finds that

Wilson has failed to adequately challenge Frolow's Initial and Supplemental Expert Reports with

the specificity needed to succeed in a <u>Daubert</u> Motion to exclude expert opinion based on

unreliability.  Nonetheless, a hearing is not necessary on this issue because most of the expert

opinions provided by Frolow are moot due to the Court's separate finding that he is precluded

---

[4]Frolow filed an Initial Expert Report and a Supplemental Expert Report.  Then an
additional expert report was filed in the form of an attachment to Frolow's declaration in
opposition to this Motion for Summary Judgment.  <u>See</u> Key Certif., Ex. 9, Frolow Expert Report;
Key Certif., Ex. 10, Frolow Supplemental Expert Report; Frolow Decl., Ex. A1-A5.

from using the doctrine of equivalents by prosecution history estoppel.[5]  However, the Court also finds that Frolow's reply to Severa's Expert Report is an untimely submission of a supplemental expert report, and as such, strikes it from the record.

The Supreme Court set forth the standard for admitting expert opinions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Daubert made trial courts the gatekeepers for determining the admissibility of expert opinions and confirmed that in order for an "opinion" to be admissible as "'scientific knowledge,' an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation - i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590.  Federal Rule of Evidence 702 governs the admissibility of expert opinions and was amended in response to Daubert.  The amended "Rule 702 has three major requirements:  (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.  We have interpreted the second requirement to mean that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" Pineda v. Ford Motor Co., No. 07-1191, 2008 U.S. App. LEXIS 6091, at *14 (3d Cir. March 24, 2008) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-42 (3d Cir. 1994)).

> A trial court should consider several factors in evaluating whether a particular methodology is reliable. These factors, enunciated in Daubert and this Court's decision in United States v. Downing, 753 F.2d 1224 (3d Cir. 1985), may include: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the

_____

[5]A Daubert hearing is a pretrial hearing where a court determines whether a proffered expert opinion is both relevant and reliable, and thus admissible as evidence, pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, No. 07-1191, 2008 U.S. App. LEXIS 6091, at *26-27.

## 1.    Admissibility of Expert Reports Based on Unobserved Facts

An expert's "unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact." Arthur A. Collins v. Northern Telecom Ltd., 216 F.3d 1042, 1046 (Fed. Cir. 2000). Instead the expert must include the facts upon which his conclusions were reached. See id.; Zelinski v. Brunswick Corp., 185 F.3d 1311, 1317 (Fed. Cir. 1999). However,

> the Federal Rules of Evidence establish that an expert need not have obtained the basis for his opinion from personal perception. See e.g., Sweet v. United States, 687 F.2d 246, 249 (8th Cir. 1982); Data Line Corp. v. Micro Techs., Inc., 813 F.2d 1196, 1200-01 (Fed. Cir. 1987). Likewise, numerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for purposes of Rule of Evidence 703. See e.g., Ratliff v. Schiber Truck Co., 150 F.3d 949, 955 (8th Cir. 1998) (holding that expert testimony regarding a report prepared by a third party was properly allowed); see also Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94, 95 (2d Cir. 2000) (finding that testimony was properly admitted from an expert who did not conduct his own tests). "Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge."

Monsanto Co. v. David, No. 2007-1104, 2008 WL 304751 (Fed. Cir. Feb. 5, 2008) (quoting

Daubert, 509 U.S. at 592).

First, Wilson argues that because Frolow failed to conduct his own infringement testing and did not examine any tennis racquets for his Initial and Supplemental Expert Reports, that the reports themselves are inadmissible. (See Pl.'s Br. p. 17). This view is mistaken because

Frolow's expert reports are based upon Wilson's own Product Evaluation Reports, which contain test data generated on behalf of Wilson.  As the Federal Circuit recounted in <u>Monsanto Co.</u>, it is well established that it is not necessary for an expert himself to have performed the testing required to give an expert opinion.  The conclusions in Frolow's expert reports are not bare unsupported conclusions because they are based upon the facts derived from Wilson's own test data.  Frolow's opinions are based on a mathematical analysis (using standard deviations) of data from the Product Evaluation Reports provided by Wilson.  Wilson fails to address the reliability of the methods used by Frolow with the specificity required for the Court to declare them unreliable and does not even reference the <u>Daubert</u> factors that are required for the Court to make a determination of the reliability of an expert's methodology.  Accordingly, Wilson's Motion to Strike these expert reports is denied without prejudice.[6]  Thus, for purposes of deciding this Motion Frolow's Initial and Supplemental Expert Reports will be considered.

## 2.    Discovery Sanctions for Submission of Untimely Expert Report

Second, Wilson asks the Court to strike Exhibit A-1 through A-5 of Frolow's declaration (filed with his Memorandum In Opposition) as an untimely expert report.  The "grant or denial of a motion to strike is not an issue unique to patent law, and we therefore apply the law of the regional circuit." <u>Bose Corp. v. JBL, Inc.</u>, 274 F.3d 1354, 1360 (Fed. Cir. 2001).

> In considering whether the exclusion of evidence is an appropriate sanction for failure to comply with discovery duties, we must consider four factors: (1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the

---

[6]The Court rules on this issue without prejudice, but notes that a hearing or further argument on this issue is moot due to the Court's finding that Frolow is precluded from using the doctrine of equivalents. See supra, pp. 34-40.

case or other cases in the court; and (4) bad faith or wilfulness in failing to comply
with a court order or discovery obligation.

<u>Nicholas v. Penn. State University</u>, 227 F.3d 133, 148 (3d Cir. 2000) (citing <u>Konstantopoulos v.</u>
<u>Westvaco Corp.</u>, 112 F.3d 710, 719 (3d Cir.1997)).

     In this litigation, the pretrial scheduling order of June 15, 2006, required that the parties
serve copies of their respective expert reports no later than September 29, 2006, and rebuttal
expert reports no later than November 10, 2006.  Doc. No. 20, Pretrial Scheduling Order.  This
order was amended by the Honorable Tonianne J. Bongiovanni, U.S.M.J., in a letter order dated
September 12, 2006, revising the discovery deadlines so that the Plaintiff's expert report was due
no later than November 3, 2006 and Defendant's rebuttal expert report was due no later than
December 4, 2006.  <u>See</u> Doc. No. 23, Letter Order.  On November 28, 2006, Magistrate Judge
Bongiovanni revised the discovery deadlines so that Plaintiff's supplemental expert report was
now due December 29, 2006 and Defendant's expert report was due January 31, 2006 [sic]. Doc.
No. 26, Letter Order.  On February 15, 2007, Magistrate Judge Bongiovanni again revised the
discovery deadlines so that Defendant's expert report was due March 21, 2007. Doc. No. 28,
Letter Order.  On April 5, 2007, Magistrate Judge Bongiovanni entered a letter order requiring
the deposition of William Severa be taken no later than May 18, 2007.  Doc. No. 31, Letter
Order.  Finally, a letter was submitted on May 18, 2007 by Erica S. Helms, Esq., counsel for
Wilson, withdrawing its Motion to Quash, and stating that the only remaining discovery in this
case was the deposition of Mr. Severa; this letter was "so ordered" by Magistrate Judge
Bongiovanni.  Doc. No. 35, Letter Order.

     On September 28, 2007, Frolow filed a response in opposition to this Motion for

Summary Judgment containing an untimely reply to the expert report of William D. Severa as Exhibit A in his declaration. Frolow's reply to Severa's expert report was well past Magistrate Judge Bongiovanni's May 18, 2007 letter order, which stated that the only discovery remaining was the deposition of William Severa. Since Frolow did not seek leave of the Court to file another rebuttal or reply to Severa's Expert Report, his submission on this Motion effectively circumvented the Court's order regarding the submission of expert reports. Certainly Wilson must have been surprised to see this submission in opposition to its Motion for Summary Judgment, since the close of expert discovery occurred months earlier. Accordingly, this factor militates in favor of the Court striking Frolow's reply to the expert report of Severa.

If Frolow's reply to Severa's expert report were allowed to be entered into the record, then Wilson would be unable to cure such prejudice without expending additional time, resources, and money. While Wilson could supplement its own expert report in opposition to Frolow's reply, this would require discovery to be reopened, and further unreasonably delay the litigation. It is also not readily apparent whether Frolow has submitted this reply expert report in bad faith in an attempt to disregard a court ordered discovery obligation. Considering all the circumstances, the Court exercises its discretion to strike Frolow's reply expert report, which was submitted as a last ditch response to the pending Motions.

### 3.    Motion to Strike Paragraph 9 of Frolow Declaration

Finally, Wilson also objects to paragraph 9 of the declaration of Frolow (filed with his Memorandum In Opposition), wherein he purports to state what the Patent Examiner was thinking when he rejected certain claims during the prosecution of what became the '372 Patent. "A supporting or opposing affidavit must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e).  Since the thoughts of the patent examiner when rejecting certain '372 Patent claims are not within the bounds of Frolow's personal knowledge, the Court finds that the first sentence of paragraph 9 of Frolow's declaration must be struck from the record and will not be considered for purposes of deciding this Motion.

## B.    STANDARD FOR NON-INFRINGEMENT

In license disputes over royalties, where the licensed articles are confined to a specific patent, "[t]he test to be applied is whether [the licensee] would have been an infringer under the rules of the patent law" if there were no license agreement between the parties. Cold Metal Process Co. v. United Engineering & Foundry Co., 235 F.2d 224, 229 (3d Cir. 1956) (suit brought to determine royalties due under patent license where parties dispute whether articles were licensed, test is whether licensee would be infringer but for the license).  Thus, Frolow is required to show that each of the 42 disputed racquets would have infringed the '372 Patent "but for" the License Agreement.  The determination of infringement requires a two step process in which the claims are construed and then the properly construed claims are applied to the "accused" device. Caterpillar Tractor Co. v. Berco, S.P.A., 714 F.2d 1110, 1114 (Fed. Cir. 1983).  Once the claims are construed, the Court will make a determination of whether literal infringement or infringement under the doctrine of equivalents is present.

## C.    CLAIM CONSTRUCTION

"Claim construction is a question of law," for the trial courts to decide. Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1163 (Fed. Cir. 2004) (citing Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir.1998) (en banc)).  "It is well-settled that, in interpreting an asserted

claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.  Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 (1996)).

 "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.  In such circumstances, it is improper to rely on extrinsic evidence."  Vitronics Corp., 90 F.3d at 1582; see, e.g., Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1216 (Fed. Cir. 1995) ("In construing the claims we look to the language of the claims, the specification, and the prosecution history. Extrinsic evidence may also be considered, if needed to assist in determining the meaning or scope of technical terms in the claims.") (citations omitted).  Claim terms are to be given their "ordinary and customary meaning," in other words, "the meaning that the term would have to a person of ordinary skill in the art."  Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.,  473 F.3d 1173, 1180 (Fed. Cir. 2007) (citing Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir.2005) (en banc)).  "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning."  Hoechst Celanese v. BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996).

 Each of the asserted claims in this case, including claims 10, 20, 47, 50 and 56, require values that are "greater than" or "less than" specific values.  For example, in claims 10, 20, 47

and 50, the "$I_a$" or moment of inertia about the longitudinal axis, must be "greater than 80 ounce inches squared.  In claims 10, 20 and 50, "W*Cg" (weight times center of gravity), must be "less than 160 ounce-inches." (Stmt. of Undisputed Facts, Para. 28).

In the '372 Patent, Frolow wrote some claim limitations as "greater than" and others as "less than."  This indicates that he understood the difference and intended the terms to have their plain, ordinary meaning.  "Greater" means a higher value.  "Less" means a smaller value.  Frolow's assertion that the ordinary meaning of "greater than" includes the equivalents that are "less than" is unsupportable.  The Federal Circuit has specifically interpreted a formulation using the language "no less than" as not infringing upon a patent encompassing a slightly lower ratio.  Ortho Pharm. Inc. v. Caraco Pharm. Laboratories, Ltd., 476 F.3d 1321, 1328 (Fed. Cir. 2007).  Similarly, the Federal Circuit has reached the same, obvious construction for the term "greater than" to mean a number that exceeds the other number.  Timken Co. v. U.S., 354 F.3d 1334, 1342 (Fed. Cir 2004), cert denied, 543 U.S. 976.  Accordingly, where the claims set forth a limitation of longitudinal moment of inertia ("$I_a$") as "greater than 80 ounce inches squared," (claims 10, 20, 47 and 50), the claim cannot literally mean the opposite, or less than 80 ounce inches squared. Conversely, where W*Cg is claimed to be "less than 160 ounce-inches," the limitation cannot mean the opposite, it cannot mean greater than 160 ounce-inches.

Moreover, even if the terms "greater than" and "less than" were still ambiguous after weighing all available intrinsic evidence, prior agreements signed by both parties have stipulated to the same plain and obvious claim construction found by the Court above. Key Certif., Ex. 1, Severa Expert Report, Ex. K.  In the Prince Settlement Agreement, the "$I_a$" limitation of the '372 Patent was specifically addressed and Frolow agreed to the ordinary meaning of the limitation as

follows: "the parties deem that any $I_a$ value greater than or equal to 80.01 ounce-inches[2], and any $I_a$ value less that 80.01 ounce-inches[2] is not greater than 80 ounce-inches[2]."  (Def.'s Fact. St. ¶ 77).  The Prince Settlement Agreement provides additional evidence that Frolow himself viewed the terms "greater than" and "less than" to embody a plain, ordinary, and customary meaning. Based upon this proper construction of the claim limitations, the Court now turns to the second step in the noninfringement analysis, which is the application of the properly construed claims to the "accused" device.  See Caterpillar Tractor Co., 714 F.2d at 1114.

### D.   OVERLAPPING MANUFACTURING SPECIFICATIONS WITH THE '372 PATENT

Before turning to whether the 42 disputed models of racquets literally infringe the claims of the '372 Patent it is necessary for the Court to determine whether a manufacturing specification can create a genuine issue of material fact in determining whether there is literal or doctrine of equivalents infringement.  This Court concludes that there is no basis in law to bolster Frolow's argument that a manufacturing specification overlapping with the claims of the '372 Patent can create an issue of material fact.  Most of the claims require an $I_a$ "greater than 80 oz. in.[2]."  Frolow argues that if Wilson's manufacturing specifications provide a range of $I_a$ values that fall both inside and outside the claimed limitation (e.g. $I_a$ specification of 75-81 oz.-in.[2] would be both inside and outside "greater than 80" claim limit), that there is a genuine issue of material fact as to whether infringement has occurred with that particular racquet model. Contrary to Frolow's argument "[i]t [is] the accused product, not the manufacturing specifications that is compared to the claims in determining infringement."  Rosby Corp. v. Stoughton Trailers, Inc., No. 95 C 0511, 2003 WL 22232802, *3 (N.D. Ill. September 26, 2003). Similarly in Johnson & Johnston Assocs. Inc., the Federal Circuit held that "[i]nfringement,

either literally or under the doctrine of equivalents, does not arise by comparing the accused product . . . with a commercialized embodiment of the patentee," but that the accused product must be compared with the patent claims at issue.  Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., 285 F.3d 1046, 1052 (Fed. Cir. 2002).

Moreover, even Frolow has stated that a racquet's manufacturing specification can "give[] you an idea," but you need to look at it in conjunction with actual test results. (Def.'s Fact St. ¶ 63; Pl.s Fact St. ¶ 63).  Accordingly, the determination of whether a "Licensed Article" has been sold, and whether a royalty may be owed, requires a comparison of the properly construed claims against the actual, accused device.  Numbers on a specification sheet can only show what Wilson was planning, or what it might have built, and is not indicative of actual infringement. For this reason, the Court adopts the same analysis used in Rosby Corp. to conclude that it is improper to compare Wilson's manufacturing specifications to the claims of the Licensed Patents to deduce whether infringement exists.  Instead, the Court finds that numbers derived from the testing of actual samples of the accused racquets must be compared to the claims of the Licensed Patents.  Accordingly, the manufacturing specification is not germane to the determination of infringement for purposes of this Motion for Summary Judgment.

To prevail on a Motion for Summary Judgment in an infringement case "[t]he moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the district court that there is an absence of evidence to support the nonmoving party's case." Conroy, 14 F.3d at 1575 (citing Celotex Corp., 477 U.S. at 325).  To show infringement, the second part of the infringement test requires that the actual accused device be compared to the properly construed claims.  See Rosby Corp., No. 95 C 0511,

2003 WL 22232802, at *3.  Here, the only racquet models tested were those tested by Wilson.

The record demonstrates that Frolow was given an opportunity to conduct discovery,

nonetheless, Frolow failed to produce any type of independent test data of his own regarding the

racquet models in dispute.  Indeed, the record indicates that both parties agreed that the only

discovery remaining as of May 18, 2007, was the deposition of William D. Severa.  (See Letter to

Court, Doc. No. 34, May 18, 2007). Consequently, the Court will look to the test data

accompanying the papers filed in this Motion and if there is an absence of evidence to support

Frolow's case, the Court must grant Summary Judgment in favor of Wilson.

### E.    SUMMARY JUDGMENT OF NO LITERAL INFRINGEMENT

In order "[t]o establish literal infringement, every limitation set forth in a claim must be

found in an accused product, exactly."  Southwall Technologies, Inc. v. Cardinal IG Co., 54 F.3d

1570 (Fed. Cir. 1995).  "Summary judgment on the issue of literal infringement is proper 'when

no genuine issue of material fact exists, in particular, when no reasonable jury could find that

every limitation recited in the properly construed claim either is or is not found in the accused

device.'" Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1163 (Fed. Cir. 2004); (quoting Bai v. L

& L Wings, 160 F.3d 1350, 1353 (Fed. Cir.1998)).

### 1.    Racquet Models that Wilson Alleges do not Test within any of the Relevant Claim Limitations of the '372 Patent

Wilson argues that for each of the 35 racquet models presented in Table A[7] below, at

least one required claim limitation is not met for each sample tested.  It is undisputed that claims

10, 20, 47 and 50 each have the same $I_a$ limitation of "greater than 80 oz. in.$^2$" and claim 56 has

---

[7]This table was furnished by Wilson in its reply papers.  Def.'s Reply Br. pp. 8-10.

an $I_a/I_s$ limit of "greater than 0.033."   Severa states in his expert report that the test data which

was used in Wilson's testing is "based upon the completion of standard test procedures

performed on at least three randomly selected racquets for each racquet model."  Key Cert., Ex.

A, Severa Expert Report, p.54.  Wilson's test data indicates that all 35 racquets in Table A (from

the remaining 42 racquets) are outside the literal claim limitations for every single sample.

**TABLE A: UNDISPUTED EVIDENCE OF ACTUAL RACQUET TEST DATA**

| Stock # | Racquet Name | Production Evaluation Report (Zidel Exs. D-1, D-2) | Prod. Eval. Test Data Range for Ia | Any data of Ia "greater than 80" | Any data of Ia/Is "greater than 0.033" | Specification Range for Ia is 80 oz-in$^2$ Or less |
|---|---|---|---|---|---|---|
| T5706 | HYP HAMMER 6.3 95" RKT | A490R | 73.2-74.5 | No | No | 72-78 |
| T5712 | HH 2.3 Stretch 110 | D0003R | 77.5- | No | No | |

|  |  |  | 79.8 |  |  |  |
|---|---|---|---|---|---|---|
| T5719 | HH 2.3 115 | D0003R | 77.5-79.8 | No | No |  |
| T5723 | HH 2.3 110 | D0003R | 77.5-79.8 | No | No |  |
| T5752 | HH 5.2 95 | A150R | 75.2-78.1 | No | No |  |
| T5760 | TRIAD HAMMER 6.0 | C0325R | 71.8-74.9 | No | No | 71-77 |
| T5823 | HH 2.3 110 | D0003R | 77.5-79.8 | No | No |  |
| T5862 | HH 6.2 95 | C0104R | 72.9-75.0 | No | No | 72-78 |
| T6123 | HH 2.3 Stretch 115 | D0003R | 77.5-79.8 | No | No |  |
| T7043 | HYP HMR 4.3 100 PH TNSRKT | 9126R | 76.1-77.7 | No | No |  |
| T7070 | HMR TI 7.0 95 ST TNS RKT | 9008R | 71.9-73.2 | No | No |  |
| T7163 | HYP HMR 6.3 95 TNS RKT | A490R | 73.2-74.5 | No | No | 72-78 |
| T7240 | TRIAD HAMMER 4.0 FRM | B261R | 71.6-72.7 | No | No |  |
| T7250 | RAQ TENIS TRIAD HAMMER 5.0 98 | B350R | 70.0-72.1 | No | No | 70-76 |
| T7252 | HYPER HAMMER 5.2 95 F | A150R | 75.2-78.1 | No | No |  |
| T7256 | RAQ TENIS H/H ROLLERS 5.6 95 | A732R | 75.9-78.3 | No | No | 73-79 |
| T7259 | HYP HMR 5.9 95 TNS RKT | A719R | 75.7-78.9 | No | No | 73-79 |
| T7266 | RAQ TENIS H/H ROLLERS 6.6 98 | A703R | 76.8-80.0 | No | No |  |
| T7343 | RAQ TENIS H/H 4.0 100 | B1083R | 76.8-78.6 | No | No |  |
| T7351 | RAQ TENIS HYPER P/S SURGE 5.1 98" | C0421R | 72.6-74.1 | No | No | 70-76 |
| T7362 | RAQ TENIS H/H 6.2 95 | C0104R | 72.9-75.0 | No | No | 72-78 |
| T7367 | RAQ TENIS P/S 6.7 EXTREME 95 | B1064R | 70.9-72.8 | No | No | 69-75 |
| T7405 | TRIAD 5 98 TNS FRM | D0169R | 69.8-71.5 | No | No | 68-74 |
| T7430 | TRIAD 3.0 110 TNS FRM | C0322R | 76.3-77.8 | No | No | 74-80 |
| T7436 | H6 95" | D0248R | 69.3-72.0 | No | No | 69-75 |
| T7455 | HAMMER TOUR RKT | D0175R | 75.0-77.4 | No | No | 73-79 |

| T7460 | TRIAD HAMMER 6.0 95 | C0504R | 66.4-67.3 | No | No | 67-73 |
|---|---|---|---|---|---|---|
| T7461 | TRIAD 6.0 HAMMER FRM | C0325R | 71.8-74.9 | No | No | 71-77 |
| T7465 | P/STAFF SURGE X TNS F | C0920R | 72.1-73.9 | No | No | 69-75 |
| T7476 | PRO STAFF TORCH 95 | C0854R | 67.7-70.8 | No | No | 67-73 |
| T7513 | T3 MID 100" RKT | DC247R | 70.5-71.9 | No | No | 69-75 |
| T7536 | H TOUR 105" RKT | DH190R | 77.4-79.6 | No | No | |
| T7537 | H BLAZE 95" RKT | DC243R | 72.6-75.7 | No | No | 70-76 |
| T7576 | PRO STAFF TRANCE 95" RKT | DX081R | 68.0-70.8 | No | No | 67-73 |
| T4043 | HYPER PROSTAFF EXTREME 95 | B1064R | 70.9-72.8 | No | No | 69-75 |

If Wilson's test data were the only test data presented to the Court concerning the racquet models in dispute, Wilson would be entitled to summary judgment that none of these 35 racquet models are Licensed Articles. However, Frolow has brought to the Court's attention contrary results derived from the test data found in Production Evaluation Reports provided in discovery by Wilson. (Zidel Decl. ¶ 15 Ex. D). Frolow aggregated this data into charts which indicate that racquet models T7455 and T5712 literally fall within all of the claim limitations of Claims 47 and 50. (See Zidel Decl. ¶ 15 Ex. E-F). The Production Evaluation Reports are based on actual sample racquets, and thus present an issue of material fact as to whether racquet models T7455 and T5712 infringe upon the '372 Patent. (See Zidel Decl. Ex. D; compare, Zidel Decl. ¶ 15 Ex. E-F). Frolow has not presented his own test data and has not directed the Court to any

other data provided in discovery to dispute the results of the other 33 racquets in Table A.[8]

Consequently, the Court finds that there is no literal infringement with regards to all racquet

models in Table A, other than racquet models T7455 and T5712.[9]

> **2.  Racquet Models that Wilson alleges test within the "greater than 80 oz. in.²" claim limitation, but fail to test within other limitations of a relevant claim of the '372 Patent**

In Table B[10] below, there are 7 racquets as to which one or more racquet model samples

tested within an $I_a$ range greater than 80 oz. in.².  Wilson contends that these 7 out of the 42

disputed racquet models are still not Licensed Articles since each one fails to meet at least one

other limitation for each claim of the Licensed Patents.[11]  However, the Court's own inspection

---

[8]The Court notes that claim 10 and claim 20 include limitations for the "Longest Vertical String" and "Longest Horizontal String."  It does not appear that there is any data that was produced during discovery or in the test data supplied by Wilson that shows these limitations were met for any of the 42 disputed racquet models; nor does Frolow produce such data.  As a consequence, it would be impossible for a jury to conclude that these two claims were infringed because not enough data is available to make such a finding.

[9]Notwithstanding that none of the actual sample racquets from Wilson's testing fall within the claim limitations of the '372 Patent, the Court notes that 22 of these 35 racquets also have a specification range that is entirely outside of the '372 Patent claim limitation of "greater than 80 ounce inches squared." The right hand column of Table A establishes this point.

Conversely, the manufacturing specification range for 13 of the racquets in Table A falls within the "less than 80 ounce-inches squared" claim limitation of the '372 Patent.  This in itself does not create an issue of material fact because the manufacturing specification is not relevant in determining infringement.  See infra pp. 27-29.

[10]This table was furnished by Wilson in its reply papers.  Def.'s Reply Br. at p. 11.

[11]A fair reading of the test data presented in Table B, column 4,  "Reasons why Racquet is Outside Asserted Claims 10, 20, 47, 50, and 56" is that every sample tested for each racquet model is outside the claim limitations in that row (range of test samples is outside of claim limitations) as opposed to the average value for the samples for that racquet model being outside of the claim limitations indicated.

of the record reveals that there is a genuine issue of material fact as to models:  T5832, T7067

and T7230 because the Production Evaluation Reports provided by Wilson in discovery show

that at least some sample racquets of these models fall within a range that meets all the claim

limitations of the '372 Patent claims.  (Zidel Decl. ¶ 15 Ex. E-F).  Frolow has not identified any

information exchanged in discovery that would dispute the test data for racquet model T4783.

Similarly, although Frolow has aggregated data for racquet models T4439E, T4828E, and T7173

showing that some of the claim limitations have been met, there is no evidence in the record that

could allow a juror to make a determination that all the limitations of any one of the claims of the

'372 Patent has been infringed.  Frolow has not conducted his own testing on any of the disputed

racquet models.  Therefore, the Court grants summary judgment of no literal infringement in

favor of Wilson as to racquet models: T4439E, T4828E, T4783 and T7173.  A material issue of

fact exists as to the literal infringement of the other racquet models listed in Table B.[12]

---

[12]There are two racquet models identified by Frolow (T4825E, T4849E) which are not part of the 42 racquet models contested in this Motion for Summary Judgment.  Discovery provided by Wilson in the form of Production Evaluation Reports indicate that these two racquet models may infringe the '372 Patent.  Zidel Decl. ¶ 15 Ex. E-F.  However, since they are not the subject of this Motion, the Court will not address them in any more detail.

**TABLE B: UNDISPUTED EVIDENCE OF ACTUAL RACQUET TEST DATA**

| Stock # | Racquet Name | Production Evaluation Report (Zidel Exs. D-1, D-2) | Reasons Why Racquet is Outside Asserted Claims 10, 20, 47, 50 and 56 |
|---|---|---|---|
| T5832 | TRIAD HAMMER 3.2 115 | B251B | Ia/Is < 0.033, Cp/L < 0.7, W< 10.7 oz.& Ia < 80 oz-in2 |
| T7067 | PS TI 6.6 110 TNS RKT | 9147R | Cp < 18.75 in., W < 10.7 oz., Freq. < 160 Hz & Cp/L < 0.7 |
| T7173 | HAMMER TI 7.3 100 TNS RKT | A156R | Ia < 80 oz-in2, W < 10.7 oz., Freq. < 160 Hz & Ia/Is < 0.033 |
| T7230 | TRIAD Hammer 3.0 115 | B251B | Ia/Is < 0.033, Cp/L < 0.7, W< 10.7 oz.& Ia < 80 oz-in2 |
| T4828E | HYPER PRO STAFF 5.0 110(F | B127R | Cp < 18.75 in., W > 10.7 oz., Freq. < 160 Hz, Ia/Is < 0.033 & Cp/L < 0.7 |
| T4439E | ULTRA CS STRETCH TITANIUM 102 | 9045R | Freq. < 160 Hz, W > 10.7 oz, Ia/Is < 0.033 & Cp/L < 0.7 |
| 106-27.25 [T4783] | Pro Staff Six One | EH032R | Ia < 80 oz-in2, Cp < 18.75 in., W >10.7 oz., Freq. < 160 Hz, Cp/L < 0.70  & Ia/Is < 0.033 |

## F.   SUMMARY JUDGMENT OF NON-INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

### 1.   Prosecution History Estoppel

"The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd., 535 U.S. 722, 733 (2002). In applying the doctrine of equivalents, one looks at the device to see "if it performs substantially the same function in substantially the same way to obtain the same result." Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 38 (1997). "Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process. Estoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.'" Festo Corp., 535

U.S. at 733 (quoting Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220-221

(1940)).  "When the patentee responds to the rejection by narrowing his claims, this prosecution

history estops him from later arguing that the subject matter covered by the original, broader

claim was nothing more than an equivalent. Competitors may rely on the estoppel to ensure that

their own devices will not be found to infringe by equivalence." Id. at 727.

The patentee bears the burden of establishing that an amendment was not made for

reasons related to patentablility.  Id. at 739.  "When the patentee is unable to explain the reason

for amendment, estoppel not only applies but also 'bar[s] the application of the doctrine of

equivalents as to that element.'"  Id. at 740 (quoting Warner-Jenkinson Co., Inc., 520 U.S. at 33).

The patentee also bears the burden of demonstrating that the amendment does not surrender the

particular equivalent in question.  Id.  Whether the patentee has rebutted the presumption of

surrender is a question of law for the Court.  Biagro Western Sales, Inc. v. Grow More, Inc., 423

F.3d 1296, 1305 (Fed. Cir. 2005).

> A patentee may rebut the presumption of surrender by showing that at the time of
> the amendment one skilled in the art could not reasonably be expected to have
> drafted a claim that would have literally encompassed the alleged equivalent.
> Festo, 535 U.S. at 741.  The Supreme Court identified three ways in which the
> patentee may overcome the presumption. The patentee may show that the alleged
> equivalent would have been unforeseeable at the time of the amendment, that the
> rationale underlying the amendment bore no more than a tangential relation to the
> equivalent in question, or that there was "some other reason" that the patentee
> could not reasonably have been expected to have described the alleged equivalent.
> Festo, 535 U.S. at 740-41.

Id. at 1296.

Frolow relies upon a questionable, pre-Festo case, Hi-Life Products, Inc. v. Am. Nat'l

Water-Mattress Corp., 842 F.2d 323 (Fed. Cir. 1988), to argue that he is not barred by

prosecution history estoppel.  In that case, the Federal Circuit held that when a "patentee did not

-36-

amend the claims to avoid cited prior art, but rather to better define a patentable invention," the patentee was not estopped from contending that the patent was infringed under doctrine of equivalents for the amended subject matter.  Id. at 326.  Frolow argues that just as the patentee in Hi-Life Products, Inc., he added the $I_a$ limitation to his patent to improve the invention and not to avoid prior art.  However, under Festo and its progeny, Frolow bears the burden of showing that the amendment was not made to avoid the prior art and that the equivalent in question could not be embodied in the patent for some other reason.  Here, there is no reason, other than to avoid the prior art, why Frolow couldn't have included the alleged equivalent in the language of his patent. Additionally, there was no after arising technology that prevented Frolow from capturing the equivalent of less than 80 ounce-inches squared at the time of patenting.  Accordingly, the law supports a finding that Frolow is estopped from arguing that an $I_a$ of less than 80 ounce-inches squared is equivalent to an $I_a$ greater than 80 for claims 10, 20, 47, and 50.

In Talbert Fuel Systems Patents Co. v. Unocal Corp., 347 F.3d 1355 (Fed. Cir. 2003), the Federal Circuit, relying upon Festo, determined that where a claim has been rejected based on a prior art reference, and a subsequent amendment is directed to disclosures in that prior art, the patentee is estopped from reclaiming ground necessarily given up by the amendment.  Talbert, 347 F.3d at 1359 ("When the prior art embraces the alleged equivalent, and a narrowing amendment was made to avoid that equivalent, that subject matter cannot be found to have been unforeseeable at the time of the amendment."). This is squarely applicable to Frolow's arguments that he can recapture an $I_a$ as low as 69 ounce-inches squared.

As set forth in Wilson's Motion, Frolow responsively amended his claims in order to overcome rejections dated October 10, 1984, May 3, 1985, October 22, 1985, August 7, 1986,

and March 3, 1987.  As part of these amendments Frolow added the limitation: "the magnitude of $I_a$ is greater than 80 ounce-inches squared."  Frolow's claims had been rejected by the U.S. Patent and Trademark Office based on prior art patents including Frolow's own U.S. Patent No. Re. 31,419 ("the '419 Patent").  The '419 Patent disclosed an $I_a$ value of 71.2 oz-in squared.  Although, Frolow argues that his "$I_a$ is greater than 80 ounce-inches squared" amendments were not made to overcome prior art, he nonetheless concedes in his brief that he introduced the $I_a$ greater than 80 oz-in. squared limitation in the context of explaining to the patent examiner that his own prior art patent did not include such a limitation.  Accordingly, when Frolow narrowed his claims by adding the "greater than 80" limitation, he intentionally and consciously gave up all ground below "greater than 80 ounce inches squared."

Frolow also argues that his amendments to claims 46 and 50, which recite an $I_a$ greater than 75 oz-in[2,] show that he did not intend on giving up all equivalents below 80 oz.-in. squared in his other claims.  However, this argument falls short of rebutting the presumption set forth in Festo that an amendment in response to a rejection surrenders the particular equivalent in question.  Festo Corp., 535 U.S. at 740.  In fact, Frolow has not offered a single reason, that comports with the acceptable rationales set forth by the Supreme Court in Festo, to rebut this presumption.  He has not argued that the equivalent would have been unforeseeable at the time of amendment.  Moreover, his rationale, that the amendment was intended to better define the invention, is questionable at best and fails to show that the amendment limiting the $I_a$ range to above 80 in.-oz. squared bore a mere tangential relationship to the purported equivalent of the range below it.  There is simply no other reason imaginable that could explain how the purported equivalent of 80oz-in. squared or below could not have been reasonably expected to have been

adequately described in the patent claims.  Therefore, as a matter of law, the Court grants

summary judgment to Wilson barring Frolow's reliance on the doctrine of equivalents to

recapture $I_a$ values of 80 in.-oz. squared and below.[13]

Finally, as to the remaining limitations in the asserted claims,[14] Frolow has never

provided any data or test results to support his additional equivalents assertions.  Frolow has no

facts in the record to establish that substantially the same function, in substantially the same

way, with the same result, is present in racquets with frequencies lower than claimed, centers of

percussion lower than claimed, an $I_a$ / $I_s$ ratio lower than claimed, a Cp/L ratio less than

claimed, and weight times center of gravity (W*Cg) greater than claimed.  Frolow's

Memorandum in Opposition is also devoid of arguments relating to these equivalents.  Since

Wilson "need not produce evidence showing the absence of a genuine issue of material fact but

rather may discharge its burden by showing the district court that there is an absence of evidence

to support the nonmoving party's case," the Court grants summary judgment in favor of Wilson,

precluding Frolow from capturing any equivalents relating to frequencies, centers of percussion,

$I_a$ / $I_s$ ratios, Cp/L ratios and W*Cg.  Conroy, 14 F.3d at 1575 (citing Celotex Corp., 477 U.S. at

_____

[13]Wilson makes additional arguments, in the alternative, against Frolow's use of the
doctrine of equivalents, specifically that: (1) an $I_a$ range of 69.5 oz-in. squared is not the
Equivalent of 80.08 oz-in. squared; and (2) the equivalents that Frolow argues fall under the
DOE render a claim meaningless and thus, are barred.  The Court does not reach the merits of
either of these arguments due to the dispositive effect of prosecution history estoppel.

[14]Frolow incorrectly indicated in footnote 4 of his Memorandum in Opposition, that
Wilson "does not contend that any of those other parameters [limitations in addition to $I_a$] should
not be permitted a range of equivalents."  To the contrary, Wilson asserts in its Motion that
Frolow has failed to establish the equivalent elements for all of the claim limitations.  See Def.'s
Br. for Summ. J., p. 8; see also Key Certif., Ex. 1, Severa Expert Report, pp. 32 – 42 (Emphasis
added).

325).

### 2.      Prior Contractual Position as Bar of Doctrine of Equivalents

In its moving papers, Wilson argues that Frolow should be barred from asserting the

doctrine of equivalents for $I_a$ values of 80 oz.-in. squared or less because of the position taken in

the Prince Settlement Agreement that "any $I_a$ value greater than or equal to 80.01 ounce-inches is

greater than 80 ounce-inches[2], and any $I_a$ value less than 80.01 ounce-inches is not greater than

80 ounce-inches[2]," for purposes of infringement and interpretation of the claims of the '372

Patent.  See Key Cert. Ex. 1 Severa Expert Report, Ex K.  In addition, Wilson references the

Garrett Affidavit, which at the time of the Prince Lawsuit listed a racquet as not infringing the

'372 Patent that met every limitation of claim 20 of the '372 Patent except the greater than 80 in-

oz. squared limitation.  (Def. Fact St. ¶ 93).  Wilson argues that Frolow agreed to this

interpretation; however, Frolow denies knowledge of the affidavit and states that he was not even

aware that the lawsuit was brought.  (Pl.'s Fact St. ¶93).

"In patent cases . . . consent decrees entered in settlement of an infringement action are

entitled to res judicata effect."  Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 97 (3d Cir 1981);

see Brunswick Corp. v. Chrysler Corp., 408 F.2d 335, 337-38 (7th Cir. 1969); Siebring v.

Hansen, 346 F.2d 474, 477 (8th Cir.), cert. denied, 382 U.S. 943 (1965).  "But settlements

ordinarily occasion no issue preclusion (sometimes called collateral estoppel), unless it is clear . .

. that the parties intend their agreement to have such an effect."  Arizona v. California,

530 U.S. 392, 414 (2000).  The general rule is that issue preclusion attaches only "[w]hen an

issue of fact or law is actually litigated and determined by a valid and final judgment, and the

determination is essential to the judgment." Restatement (Second) of Judgments § 27, p. 250

(1982).   The Prince Settlement Agreement reached between Prince, Wilson and Frolow was not part of a consent order and it is not clear that the parties intended the infringing I$_a$ range to have the effect of collateral estoppel.  <u>See</u> Key Cert. Ex. 1 Severa Expert Report, Ex K.  Therefore, based on this record, the Court finds that collateral estoppel is not applicable to Frolow in connection with the previous Prince Settlement Agreement between him, Wilson and Prince.

### G.   USE OF WILSON'S "HAMMER" TRADEMARK DOES NOT ESTABLISH AN ISSUE OF MATERIAL FACT AS TO WHETHER A RACQUET MODEL IS A "LICENSED ARTICLE"

Wilson argues that even though certain of the disputed racquets utilized the "Hammer" trademark it is not probative as to whether such racquets are Licensed Article(s).  Frolow argues that the "Hammer" trademark is relevant to the determination of what is a "Licensed Article(s)" because during the Prince Lawsuit, the Garrett Affidavit specifically stated that racquets bearing the "Hammer" trademark, fell within the scope of the Frolow Licensed Patents. (Key Certif. Exh. 1; Severa Exp. Rpt. Exh. L at 7-9.).  However, since then Wilson contends that it has chosen to use the "Hammer" trademark on certain racquets that fall within the '372 Patent, and other racquets which are outside the '372 Patent.  Either way, the use of a trademark does not constitute patent infringement.  Furthermore, the Garrett Declaration was filed years before the Audit Period, and regarded pre 1996 Wilson racquets that bore the Wilson trademark "Hammer." It perplexes the Court how such a declaration could have any bearing on an infringement analysis, which requires a comparison of the accused device to the properly construed claims. <u>See</u> <u>Caterpillar Tractor Co.</u>, 714 F.2d at 1114.

In addition, Frolow has failed to cite to a single case in which a court found patent infringement based upon the brand name of the device.  Frolow argues that he is entitled to a trial

on most of the remaining racquets in the case because they bear a "Hammer" trademark.  Frolow makes this argument even though: (a) he does not dispute that this is not a trademark case; (b) he does not dispute the fact that Wilson, not Frolow, owns the "Hammer" trademark; and (c) Frolow does not dispute the fact that the License Agreement requires royalties to be paid on racquets within the claims of the '372 Patent, and says nothing about the use of trademarks.  If this is not a trademark case, and the patent License Agreement says nothing which links a royalty obligation to the use of a trademark alone, then Frolow cannot prevail on this argument as a matter of law. Therefore the Court grants summary judgment in favor of Wilson and holds that the use of the Wilson trademark ("Hammer"), on any disputed racquet does not in any way equate with patent infringement or raise an issue of material fact as to patent infringement of the '372 Patent.

### H. PATENT MIS-MARKING DOES NOT ESTABLISH AN ISSUE OF MATERIAL FACT AS TO WHETHER A RACQUET MODEL IS A "LICENSED ARTICLE"

Wilson admitted to the Court and Frolow confirmed by inspection that 14 of the 42 racquet models in dispute were mis-marked by Wilson with Frolow's patent numbers.  (Frolow Decl. ¶ 19).  Inadvertent marking of a patent number on a device is not legally sufficient to create an issue of material fact because it has no bearing on whether literal or doctrine of equivalents infringement has occurred.  See Bai v. L & L Wings, 160 F.3d 1350, 1353 (Fed. Cir.1998) (Summary judgment on the issue of literal infringement is proper "when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device."); Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1360 (Fed. Cir. 2002) (Summary judgment of noninfringement under the doctrine of equivalents is appropriate if "no reasonable jury could

determine two elements to be equivalent.").

Both parties make numerous arguments about the relevance of the mis-marking of the racquet models in question, however, none are relevant to this Motion for Summary Judgment. Frolow has not brought a claim of patent mis-marking against Wilson and whether the mis-marking was inadvertent or intentional does not have a bearing upon whether any of the 42 disputed racquet models infringe the '372 Patent.[15]   See Crane Co. v. Aeroquip Corp., 364 F. Supp. 547, 560 (N.D. Ill. 1973), aff'd in part & rev'd in part on other grounds, 504 F.2d 1086 (7th Cir.1974).

## I.     FROLOW'S CLAIM OF INDUCEMENT OF PATENT INFRINGEMENT BASED ON WILSON'S SALE OF LEAD TAPE IS WITHDRAWN

In Plaintiff's Responses To Defendant's Rule 56.1 Statement Of Undisputed Facts, Frolow concedes in paragraphs 57 – 61 that "Frolow is no longer asserting that Wilson induces infringement or is a contributory infringer based on sales of lead tape."[16]   In addition, on April 5, 2006, the Honorable Stanley R. Chesler, U.S.D.J., entered an order dismissing all of Frolow's patent claims against Wilson. Key, Certif., Ex. 1, Severa Expert Report, Ex. D, Judge Chesler's

---

[15]Even though patent mis-marking has no bearing on the issue of infringement, at least one court has held that such mis-marking creates "marking estoppel," thus forcing the licensee to pay royalties on all mis-marked devices.  Crane Co. v. Aeroquip Corp., 364 F. Supp. 547, 560 (N.D. Ill. 1973) (estopping licensee who had marked product with patent markings from contesting patentee's right to royalties despite finding of noninfringement), aff'd in part & rev'd in part on other grounds, 504 F.2d 1086 (7th Cir.1974) (court declined to reach the marking issue); see SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 890,91 (Fed. Cir. 1988) (federal circuit declined to comment on the validity of the "marking estoppel" line of cases, but distinguished the holding in Crane, factually, from the case before it).

[16]The Court notes that in Frolow's third expert report, Zidel Ex. A-1 to A-5, Frolow continues to argue the sale of lead tape induces infringement.  However, the Court excluded this expert report for lack of timeliness.  See infra pp. 21-23.

Apr. 5, 2006 Order.  Thus, given the concession of Frolow, and Judge Chesler's Order, Wilson's request to dismiss this claim is moot.

### J.    HEAD COVERS AS "LICENSED ARTICLES"

Judge Chesler has also ordered that "any dispute about the actual calculation of damages, including Plaintiff's claim that deductions taken by Wilson from net sales were not authorized under the License Agreement, will be subject to the dispute resolution mechanism set forth in Section 4.2 of the License Agreement."  Chesler Order, Doc. No. 16, April 5, 2006.  Judge Chesler, in his accompanying opinion, states that, "[i]n short, the agreement clearly is predicated upon an assumption that there not be a dispute about what constitutes a Licensed Article," and as a consequence leaves it up to the Court to determine what racquet models constitute a Licensed Article.  Chesler Opinion p. 6, Doc. No.15.  However, it appears that Frolow is arguing that racquet head covers sold as accessories to the 42 racquet models in dispute are part of the '372 Patent and hence Licensed Articles.  (Pl.'s Fact St. ¶ 13).  Although Wilson argues that all head covers (whether sold with undisputed racquet models or separately) are not Licensed Articles in Severa's expert report, it appears that Wilson concedes in its moving brief that a racquet sold with a head cover is within the claims of the '372 Patent, and thus a Licensed Article.  (Def's Br. p.13).  Either way, the Court holds that to the extent that the course of performance[17] under the License Agreement shows that royalties were paid to Frolow based on sales of racquet head covers for racquet models that are Licensed Articles, those head covers are themselves Licensed Articles; conversely, to the extent that the course of performance under the License Agreement

---

[17]A "course of performance" refers to actions with respect to the contract taken after the contract has formed. U.C.C. § 2-208(1).

shows that royalties were not paid to Frolow based on sales of racquet head covers for racquet models that are Licensed Articles, those head covers are not Licensed Articles.

## V.      CONCLUSION

In accordance with the reasons set forth above, Wilson's Motion for Summary Judgment is granted in part and denied in part.  Out of the 42 disputed racquet models, the following have survived this Motion for Summary Judgment:  T7455, T5712, T5832, T7067 and T7230.  An appropriate Order will follow.


Dated: March 31, 2008


                                                s/ Freda L. Wolfson
                                                The Honorable Freda L. Wolfson
                                                United States District Judge